**Affirmed and Memorandum Opinion filed March 31, 2022.**



In The

# Fourteenth Court of Appeals

### NO. 14-21-00430-CV

## IN THE INTEREST OF L.A.V. AND S.H.V.

**On Appeal from the 314th District Court
Harris County, Texas
Trial Court Cause No. 2019-03748J**

## MEMORANDUM OPINION

Mother and Father separately appeal the final order terminating their parental rights to their infant twin daughters, L.A.V. ("Ludmila") and S.H.V. ("Serafina").[1]  In two issues, Father first asserts that the trial court lost jurisdiction over the suit before entering the termination order (rendering the order void), and second that he was denied his due process right to a fair and impartial trial.  In Mother's sole issue, she challenges the legal and factual sufficiency to support the trial court's finding that termination of her parental rights was in the best interest

---

[1] We use pseudonyms to refer to appellants, the children, and other family members. See Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8.

of Ludmila and Serafina.

## I. FACTUAL AND PROCEDURAL BACKGROUND

According to Mother and Father, they needed a break from the constant visitors following the birth of their daughters and Father's father needed a sterile environment for the night while in town for cancer treatment. So, Mother and Father checked into a local hotel with their seven-week old twin daughters.

*The Department's Investigation,[2] Emergency Removal, Family Placement, and the Commencement of Termination Suit*

Mother and Father's hotel stay quickly became a matter of public concern. Prior to the Department's[3] involvement, law enforcement had been called to the hotel twice, had removed Father from the hotel, issued him a criminal trespass warning, and had returned to check on the family. The Department received multiple intakes "alleging that both parents were hiding in a La Quinta Inn hotel in the Humble area." At least one intake reportedly alleged that "[Father] is on a drinking binge and he hid his wife and twin girls at the hotel."

The Department's investigator, Jennifer McGee, went to the hotel and knocked on the room door multiple times without answer. McGee called the Sheriff's Office for assistance. When the Officer knocked on the door, Mother opened the door and began to yell for law enforcement to remove Father from the hotel room. Father became belligerent and was placed in handcuffs away from Mother. McGee reported that both parents had dilated pupils about the size of a dime. At some point the Officer called for backup because Mother and Father

---

[2] Facts described in this section pertaining to the initial investigation and removal are significantly taken from the affidavit supporting the petition for termination.

[3] We use "the Department" to refer to appellee, the Department of Family and Protective Services.

were so combative.

The hotel room was in disarray and the room reeked of alcohol. Scattered about the room were multiple large bottles of vodka, some empty, some partially full, used baby bottles and formula bottles with spoiled milk, prescription bottles, amphetamines, and opioids.

McGee reported that she could not see or hear the twins until pulling up the hotel bed's sheet, blanket and bedspreads under which they were found. The bed they were lying in had urine and feces on it, there were no clean diapers or wipes left in the hotel room, and no formula to feed the babies. One of the twins had a diaper rash, but both were otherwise discovered to be healthy.

Mother and Father were too intoxicated to consent to a Parental Child Safety Placement, so McGee provided Mother and Father emergency notice of removal. After a preliminary study, Ludmila and Serafina were placed with their maternal grandparents.

On October 11, 2019, the Department filed suit to Terminate the Parental Rights of Mother and Father based on the risks to the children's welfare associated with alcohol and substance abuse and domestic violence. That same day, the court issued an emergency order removing children, and the Department was appointed Temporary Managing Conservator ("TMC") of Ludmila and Serafina.

On October 12, 2019, Mother and Father admitted themselves into a California rehab facility for alcohol abuse treatment. It was Mother's fourth inpatient rehab admission in three years and Father' third in two years. The court created a family service plan ("FSP") for both Mother and Father. Each of their family service plans required the following:

(1) submit to random drug testing,

3

(2) maintain a safe and stable home free of drug and alcohol use for a period of no less than six months,

(3) maintain stable income through employment or other sources and provide the Department with "proof of income documentation" (ex. pay stubs),

(4) complete parenting classes,

(5) refrain from all illegal activity and consumption of alcohol,

(6) attend all meetings, court hearings, permanency conferences, and family visits,

(7) participate in the services described in his/her FSP and demonstrate her ability to apply what she has learned,

(9) participate in and successfully complete a drug/alcohol assessment and follow all recommendations,

(10) maintain a drug/alcohol free lifestyle and cultivate a circle of support away from drug/alcohol users, and

(11) participate in and successfully complete a psycho-social evaluation and follow all recommendations made from the evaluation.

Although Mother and Father's service plans were the same in virtually all respects, item "8" of Mother's service plan required Mother to "successfully complete a domestic violence assessment and follow all recommendations from the assessment", and item "8" in Father's service plan required Father to "attend, actively participate in, and successfully complete a BIPP ["Battering Intervention & Prevention Program"] assessment and follow all recommendations from the assessment".

*Mother's Testimony and Mother's Performance under the Plan*

At trial the Department put forth evidence that Mother failed to perform under the FSP. Mother completed parenting classes and completed her required psychosocial evaluation. She missed some random drug tests, and several tests

4

indicated that she failed to avoid consumption of alcohol,[4] and thus failed to maintain a drug/alcohol free lifestyle. Video evidence was admitted at trial through the testimony of Mother's landlord depicting Mother walking and stumbling about the property in what could have reasonably been perceived to be an impaired state. Mother testified that she worked for her father for a month in August 2020, but otherwise was unemployed. The Department's caseworker testified that Mother failed to "maintain a safe and stable home free of drug and alcohol use for a period of no less than six months". Mother ultimately conceded in her brief that the evidence demonstrated she failed to adhere to the terms of the FSP.

*Father's Performance Under the Plan*

At trial the Department put forth evidence that Father failed to perform under the FSP. Father completed a portion of the services in his FSP. He secured stable housing although his and Mother's lease was co-signed by Karen, Father's mother. Father also completed his parenting classes, anger management classes, and his individual psychotherapy sessions and provided documentation of completion to the Department. At the time of trial, in March 2021, Father confirmed he made approximately $8,000 per month and would work as a contract project manager at least through November 2021. But Father was unemployed between February 27, 2020 and January 2021. In this respect there was some evidence Father did not maintain stable employment as required in his FSP. Father admitted that he provided no financial support to Hazel and Cal to support his

---

[4] Between July 2020 and April 2021, Mother's hair tested negative for drugs in September 2020, twice in January 2021, and once in April 2021. Mother's urine was tested for ethyl glucuronide 16 times between July 2020 and April 2021, (indicating Mother was continuing to consume alcohol). Three tests were positive – in December 2020, January 2021, and March 2021. One test was invalid and 12 were negative. Mother tested positive for amphetamines in every random urine drug test between July 2020 and April 2021 (15 tests in all); she produced proof of a proscription for Adderall for one month.

children.

Caseworker Gomez testified regarding Father's efforts with respect to domestic violence. Father was first referred to a BIPP provider in January 2020, but he missed his scheduled appointments and in March 2020, requested a referral to a provider closer to where he was then living (in the Beaumont area). Gomez was able to identify and schedule Father with the new provider, but she continued to receive notifications that Father missed appointments. Father completed his BIPP assessment in August 2020 but missed the first three BIPP classes and was discharged by the provider. According to Gomez, Father put no effort into completing his BIPP program nor did he "show any change in behavior when it came to domestic violence." Father denied being "violent" or having a "violence problem" but agreed "no child should be in an environment [where there is domestic violence]."

Father failed to show up for all of his random drug tests. For those that he did take, he consistently tested negative for alcohol consumption but tested positive for drugs.[5] Father provided the Department with some proof that he had been prescribed Adderall and Alprazolam, which would explain at least some of the positive amphetamine and benzodiazepine results. The Department was not

_____

[5] Father submitted seven urine samples which tested for ethyl glucuronide between December 2019 and July 2020; all seven were negative. Father submitted hair samples in December 2019, February 2020, and July 2020 and these, too, were negative. Father submitted nine urine samples for drug testing: three were negative (one in December 2019 and two in June 2020) and six were positive for amphetamines (three in January 2020, two in March 2020, and one in July 2020). The sample submitted at the end of January 2020 was also positive for alprazolam.

Between July 2020 and April 2021, Father' hair tested negative for drugs in October 2020, twice in January 2021, and in April 2021. Father' urine was tested for ethyl glucuronide 15 times between July 2020 and April 2021 and each time the result was negative. Father tested positive for amphetamines in all but two random urine drug tests between July 2020 and April 2021 (14 tests in all).

6

satisfied that he provided proof sufficient to address all positive test results. Father testified that a physician had prescribed him Alprazolam in January 2020, and testified that he had been prescribed Adderall since he was diagnosed with ADD when he was 12 years old.

Ms. Games, the Department's caseworker, reported that Father did not refrain from criminal activity during the pendency of the case. Although Father had no convictions, he had charges pending at the time of trial for acts of family violence. Several witnesses testified in detail about facts supporting allegations of violence toward Mother.

*Placement, Visitation, the Twins' Development*

On January 15, 2020, Ludmila and Serafina were placed with Cal and Hazel, Father's brother and sister-in law, and have remained with them. Mother and Father had supervised visits with Ludmila and Serafina for 30 minutes every morning of every day when visits were conducted virtually (during COVID). In-person visits occurred once a week for one hour and 45 minutes. Hazel supervised the virtual visits, Cal supervised the in-person visits, and Department caseworker Jessica supervised both virtual and in person visits. Father believed visits should be more frequent and longer than the allotted time because Ludmila and Serafina were living with family.

Cal testified that both Ludmila and Serafina "are just so happy and thriving and they fit in with our family very well. We have an older daughter and an older son and it's joy. It's love. It's peace. It's been a blessing to have them in our home." Cal wants to adopt Ludmila and Serafina "because I want the full legal duty, right, obligation, authority, to take care of the girls' welfare to the best of my ability." Ms. Games, the Department caseworker, testified that "[Ludmila and Serafina] are thriving. They are growing. They are reaching all of their

developmental milestones. They are very happy." She testified about the strength of Ludmila's and Serafina's bond with Hazel, Cal, and their two children, stating, "I see that [Ludmila and Serafina] really love [Hazel and Cal]. [Ludmila and Serafina] get along well with [Hazel's and Cal's] children, and they always appear to be very comfortable in the home."

*Domestic Violence: Allegations, Testimony, Findings*

In September 2020, Father was charged with and arrested for "continuous family violence" against Mother. Mother texted her parents telling them "[Father] had been physically abusive again." Mother's parents called the police for assistance. The police and an ambulance came to Mother's and Father' home. Mother reported Father slapped her with an open hand which caused pain, and then Father punched Mother's head and nose with a closed fist which caused bleeding and pain. Mother reported Father had been drinking all day, called her names, and started an argument without any provocation and that Father had been physically abusive to her for "some time."

A month earlier, Mother had called police and reported Father had been drinking all day and "started to get into [her] face." Father became irate and then "hit," "slapped," "punched," and "pushed" her, causing her to fall and to feel pain.

Before the two were married police were called out to investigate reports of Father abusing Mother. In November 2018, Maria (after receiving a call from Karen) called police and reported Mother and Father had been abusing alcohol and fighting, that Maria had entered their apartment the day before where she found Mother injured, that Maria attempted to convince Mother (unsuccessfully) to leave the apartment, and today, asked police to check on Mother.

At trial, Mother flatly denied any history of domestic violence between her

and Father. Father also denied any domestic abuse but acknowledged the protective order signed September 24, 2020 that protected Mother from Father for 61 days. Father claimed Mother's bruises result from her falling when she is intoxicated. Father claimed he never placed his hands over Mother's face hard enough to cause her nose to bleed; Mother just occasionally gets a bloody nose. Father claimed when Karen took pictures of his bruises he told her he received them from Mother, but the bruises were actually caused when he fell moving furniture.

## *Order Terminating Parental Rights*

After argument, the trial court advised the parties it would issue a ruling the following morning. The next morning, the trial court terminated Mother's parental rights based on Section 161.001(b)(1) (D), (E), (O), and (P) of the Texas Family Code and a finding that termination was in Ludmila's and Serafina's best interest. The trial court found "by a preponderance of the evidence that [Father] committed acts of family violence against [Mother]" and also terminated Father's parental rights based on Section 161.001(b)(1) (D), (E), (O), and (P) of the Texas Family Code and a finding that termination was in Ludmila's and Serafina's best interest. The Department was appointed Ludmila's and Serafina's Sole Managing Conservator.

## II. JURISDICTION

In his first issue, Father argues that the termination order is void because the trial court's jurisdiction ended prior to the start of trial pursuant to Texas Family Code section 263.401. Under section 263.401, unless trial on the merits has commenced or an extension is granted within the time period proscribed by the statute, the trial court's jurisdiction terminates on the dismissal date and the suit is

automatically dismissed without a court order. *Interest of Z.S.*, 631 S.W.3d 313, 315 (Tex. App.—Houston [14th Dist.] 2020, no pet.). We address this issue first because, if Father's contention that the judgment is void is correct, then we, like the trial court, would lack subject-matter jurisdiction over this case. *See Freedom Commc'ns, Inc. v. Coronado*, 372 S.W.3d 621, 624 (Tex. 2012) (per curiam).

## A. Standard of Review

Whether a court has subject-matter jurisdiction is a question of law that we review de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). When a trial court's void judgment is appealed, we lack jurisdiction to address the merits of the appeal and have jurisdiction only to declare the judgment void and dismiss the underlying case. *Freedom Commc'ns, Inc. v. Coronado*, 372 S.W.3d 621, 623 (Tex. 2012); *Interest of A.F.R.*, No. 01-20-00355-CV, 2020 WL 6140181, at *4 (Tex. App.—Houston [1st Dist.] Oct. 20, 2020, pet. denied).

## B. Is the judgment void? Did the trial court have jurisdiction to terminate appellants' parental rights?

Father's argument relies on the operation of the so-called "self-executing dismissal" statute, which provides:

> Unless the court has commenced the trial on the merits or granted an extension under Subsection (b) or (b–1), on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court's jurisdiction over the suit affecting the parent-child relationship filed by the department that requests termination of the parent-child relationship or requests that the department be named conservator of the child is terminated and the suit is automatically dismissed without a court order. Not later than the 60th day before the day the suit is automatically dismissed, the court shall notify all parties to the suit of the automatic dismissal date.

Tex. Fam. Code § 263.401(a); *Interest of G.X.H.*, 627 S.W.3d 288, 296 (Tex.

2021)(describing the provision as the "self-executing dismissal"). Subsection (b) explains the requirements for a trial court to extend the timeline for the "self-executing dismissal" to take effect.  Subsection (b) states:

> Unless the court has commenced the trial on the merits, the court may not retain the suit on the court's docket after the time described by Subsection (a) unless the court finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child. If the court makes those findings, the court may retain the suit on the court's docket for a period not to exceed 180 days after the time described by Subsection (a). If the court retains the suit on the court's docket, the court shall render an order in which the court:
>
> > (1) schedules the new date on which the suit will be automatically dismissed if the trial on the merits has not commenced, which date must be not later than the 180th day after the time described by Subsection (a);
> >
> > (2) makes further temporary orders for the safety and welfare of the child as necessary to avoid further delay in resolving the suit; and
> >
> > (3) sets the trial on the merits on a date not later than the date specified under Subdivision (1).
>
> Tex. Fam. Code § 263.401(b).

In this case, the trial court awarded the Department temporary managing conservator in an order signed on October 11, 2019.  The first Monday after the first anniversary of that date is October 12, 2020. Thus, unless the trial court either (1) "commenced the trial on the merits," or (2) "granted an extension under Subsection (b) or (b–1)," the court's jurisdiction over the department's case terminated on October 12, 2020, the suit would be "automatically dismissed without a court order", and any orders after that date would be void. See *Dikeman v. Snell*, 490 S.W.2d 183, 186–87 (Tex. 1973) (holding an order entered after the

11

trial court loses jurisdiction is facially void). Trial commenced on March 2, 2021, well after the original commencement deadline. Thus, because the trial court did not commence trial on the merits by October 12, 2020, we look to whether a subsection-(b) extension had been granted. At the time Father filed his brief, our record only contained a docket sheet entry which states:

> 9/30/2020 | Mtn for continuance by parents. Branson for Mom (appeared), Jereb for Intervenor PGP (appeared), Jennifer Smith for Intervenor aunt and uncle (did not appear), Jeff Marsh for dad (appeared), Ledoux for children. State did not request the full 6 mths. EDD 12/14/21. Mediation prior to trial. Trial 12/3/20 at 1:30p and 12/4/20 9:30a.

After requesting supplementation of the clerk's record, we discovered that on October 1, 2019, the trial court also issued a written order entitled "Order Retaining Suit on Court's Docket and Setting Hearing Dates" ("Retention Order"). The Retention order states:

> the Court finds that that [sic] extraordinary circumstances necessitate the children remaining in the temporary managing conservatorship of the Department and that continuing the appointment of the Department as temporary managing conservator is in the best interest of the children.

Consistent with the docket entry that was already in our record, the written order further confirmed a trial date of December 3, 2020. The order also scheduled an automatic dismissal date of December 14, 2020, a date which matches the docket entry's notation, "EDD 12/14/21". 180 days after November 9, 2020 is May 8, 2021, which represents the furthest automatic dismissal date that could be set under the statute. Thus, the Retention Order sets an automatic dismissal date within the 180-day period, and sets out the required statutory findings under 263.401(b).

At oral argument, Father conceded that the trial court validly extended the dismissal deadline in its Retention Order. The dispute in this case relates to whether the automatic dismissal date was validly extended a second time. Several events followed relevant to this inquiry.

First, on November 11, 2020, the Texas Supreme Court's Twenty-Ninth Emergency Order Regarding the COVID-19 State of Disaster ("Twenty-Ninth Emergency Order") includes provisions affecting the application of section 263.401 in parental termination proceedings. Second, on December 1, 2020, two motions seeking to extend deadlines were filed in the trial court: Mother filed a motion to continue the trial based on her counsel's failing health, and the Department filed a motion to set a new dismissal date in the case pursuant to the Twenty-Ninth Emergency Order. The Department's motion requested that the trial extend the automatic dismissal deadline to March 22, 2021, and states:

> This County is currently under a state of disaster, the Courts have been affected by the disaster, and the [trial] Court is incapable of commencing trial by the dismissal deadline. Pursuant to the Supreme Court Order, the Department asserts that good cause exists to modify or suspend the dismissal deadline in this case.

The record contains no written order granting (or denying) the Department's December 1, 2020 motion to extend the dismissal deadline, and no written order granting or denying Mother's motion for continuance. However, our record contains a docket sheet that indicates the court granted these motions:

> 12/2/2020 | EDD and Continuance. ACA Ieshia Champs, CW did not appear, Jennifer Smith for Intervenor caregivers (did not appear), Ledoux for children, Chris Branson for Mom (appeared), Mike Craig for Intervenor PGM Kathy Van Velson (appeared), Ted Jereb for Intervenor MGM Marian Ballard (appeared). EDD-3/22/2021. Trial 1/19/21-1/22/21.

The day before oral argument in our Court, at Father's request, we were provided

the reporter's record from the December trial court hearing hearing reflected in the docket entry. The transcript reveals that both motions to extend trial had been filed and were considered in the trial court at the hearing. The record clearly indicates the hearing pertained to the motion seeking an extension based on Mother's counsel's health and the Department's motion seeking an extension pursuant to the Supreme Court's Twenty-Ninth Emergency Order. The record also clearly indicates that no party opposed the requested extension or any of the particular reasons sought for the extension, that the court granted the extension, that the court reset the automatic dismissal deadline to March 22, 2021, and that the court made no findings remotely resembling the required statutory findings in section 263.401. Accordingly, it is Father's position that in the absence of such findings, the extension order was void.

Father correctly points out that this case is not like *Interest of G.X.H.* where the court was able to rely on the implied findings of the trial court in the absence of a record. Here, we were provided a record, and the record indicates that no statutory findings were made to support the extension.

Without disputing these procedural circumstances, the Department advanced at least three arguments why the termination order in this case nonetheless remains valid, asserting that (1) Father failed to preserve an objection to the omitted findings to support the second extension order, (2) that the court's second order extending the dismissal date was based on a provision of the Twenty-Ninth Emergency Order that implicitly excuses the subsection-(b) requirements, and (3) that the court never lost jurisdiction of the termination suit filed by the intervenors.

We start with the argument that would obviate the need for the trial court to make the ordinarily required statutory findings. The Twenty-Ninth Emergency Order Regarding the Covid-19 State of Disaster, provides in relevant part:

14

3. [A]ll courts in Texas may in any case, civil or criminal—and must to avoid risk to court staff, parties, attorneys, jurors, and the public— without a participant's consent:

a. except as provided in paragraph (b), modify or suspend any and all deadlines and procedures, whether prescribed by statute, rule, or order, for a stated period ending no later than February 1, 2021;

b. in all proceedings under Subtitle E, Title 5 of the Family Code:

(i)      extend the initial dismissal date as calculated under Section 263.401(a) only as provided by Section 263.401(b) or (b-1);

(ii)      for any case previously retained on the court's docket pursuant to Section 263.401(b) or (b-1), or for any case whose dismissal date was previously modified under an Emergency Order of this Court related to COVID-19, extend the dismissal for an additional period not to exceed 180 days from the date of this Order;

Our plain reading of the Twenty-Ninth Emergency Order compels us to consider the distinction the Supreme Court makes between subsection (b)(i) and (ii), which both apply to orders extending the statutory deadline. Subsection (i) applies to initial extension orders and — by the language "*only* as provided by Section 263.401(b) or (b-1)" — maintains the Family Code's requirements imposed by that subsection, e.g. that a trial court must make statutory findings to support an *initial* extension order. Subsection (ii) on the other hand, applies to *subsequent* extension orders and for such orders implicitly suspends the requirements imposed by Section 263.401(b) or (b-1), such that a trial court having already entered an extension order complying with Section 263.401(b) or (b-1) may enter a subsequent order extending the dismissal date for up to 180 days after the date of the Emergency Order, or in this instance May 10, 2021, without otherwise complying with Section 263.401(b) or (b-1). In this case, because an extension

15

order had already been granted under 263.401(b), section 3.b.(ii) of the Twenty-Ninth Emergency Order operated to allow the trial court to grant another extension without again making findings under 263.401(b). Because the court was not required to make 263.401(b) findings when granting the second motion to extend, the trial order is not void. See Twenty-Ninth Emergency Order 3.b.(ii).

Accordingly, we overrule Father's first issue.

## IV. MOTHER'S LEGAL AND FACTUAL SUFFICIENCY FINDING

A court may terminate the parent-child relationship if the court finds by clear and convincing evidence that (1) the parent has engaged in at least one statutory predicate act and (2) termination is in the best interest of the child. *See In re N.G.*, 577 S.W.3d 230, 230 (Tex. 2019); *In re L.C.L.*, 599 S.W.3d 79, 83 (Tex. App.—Houston [14th Dist.] 2020) (en banc), *pet denied*, 629 S.W.3d 909 (Tex. 2021); *see also* Tex. Fam. Code § 161.001(b). In her sole issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights is in the best interest of the children. See Tex. Fam. Code Ann. § 161.001(b)(2).

## A. Standard of Review

Termination of the parent-child relationship is a drastic remedy and is of such weight and gravity that due process requires the state to justify termination by clear and convincing evidence. *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002); *see also In re L.G.R.*, 498 S.W.3d 195, 201 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Clear and convincing evidence is the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. Tex. Fam. Code § 101.007. This heightened burden of proof results in a heightened standard of review when

evaluating the sufficiency of the evidence. *In re L.G.R.*, 498 S.W.3d at 202.

Under a legal sufficiency review, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible, but we do not disregard undisputed facts. *Id.*

Evidence is factually insufficient if, in light of the entire record, "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction." *Id.* We assume that the factfinder resolved disputed evidence in favor of its findings if a reasonable factfinder could do so, but we do not disregard disputed evidence. *See In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020).

In this case, neither Father nor Mother has challenged any of the predicate grounds for termination on appeal. Mother and Father both conceded the trial court's findings under subsection (O). The record supports the finding that neither Mother nor Father complied with multiple components of their respective family service plans. Upon our review of the record and applying the applicable standards of review, we conclude the record evidence is legally and factually sufficient to support the trial court's finding under subsection (O).

**B. Is the trial court's order terminating Mother's parental rights supported by legally and factually sufficient evidence to support the trial court's finding that termination is the best interest of the Ludmila and Serafina?**

There is a strong presumption that the best interest of the children is served

by keeping the children with their natural parents. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing Tex. Fam. Code Ann. § 153.131(b)); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). However, prompt and permanent placement of the children in a safe environment is also presumed to be in the children's best interest. *In re S.R.*, 452 S.W.3d at 366 (citing Tex. Fam. Code Ann. § 263.307(a)). Proof of acts or omissions under section 161.001(b)(1) is probative of the issue of the children's best interest. *See id*. The considerations that the factfinder may use to determine the best interest of the children, known as the *Holley* factors, include:

> (1) the desires of the child;
>
> (2) the present and future physical and emotional needs of the child;
>
> (3) the present and future physical and emotional danger to the child;
>
> (4) the parental abilities of the person seeking custody;
>
> (5) the programs available to assist the person seeking custody in promoting the best interest of the children;
>
> (6) the plans for the child by the individuals or agency seeking custody;
>
> (7) the stability of the home or proposed placement;
>
> (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and
>
> (9) any excuse for the parent's acts or omissions.

*See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (interpreting former Tex. Fam. Code § 15.02 (since amended)); see also Tex. Fam. Code Ann. § 263.307(b) (listing factors to be considered in evaluating "whether the child's parents are willing and able to provide the child with a safe environment"). A best-interest finding does not require proof of any unique set of factors or limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371–72

*1. The children's desires or evidence of bonding*

Mother acknowledges that this is a case where the children at issue are too young to testify or verbally express their desires. Ludmila and Serafina were removed from Mother and Father when they were 7 weeks old. They lived for a few months with their maternal grandparents before being placed with Cal and Hazel, when they were about five months old. They have lived with Cal and Hazel since then. Under such circumstances the factfinder may consider that the child has bonded with the foster family, is well cared for by the foster family, and has spent minimal time with the parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

After meeting virtually and in person with Cal and Hazel and their family approximately 40 times, Ms. Schriber, the Child Advocate volunteer, testified that Ludmila and Serafina are "very bonded" with Cal and Hazel; that Ludmila and Serafina are "happy and very comfortable." Ms. Games, Ludmila and Serafina's current caseworker, echoed Schriber's comments. According to Ms. Games, "[Ludmila and Serafina] have a bond with [Hazel and Cal]. I see that they really love them. They get along well with [Cal and Hazel's] children, and they always appear to be very comfortable in the home." Hazel testified about Ludmila and Serafina's favorable relationship and healthy interaction with their older children. Cal testified about a positive bond Ludmila and Serafina's beyond their home, with their community.

Ludmila and Serafina's maternal grandmother testified that the twins were fully integrated into and part of Cal and Hazel's family and that they were treated no differently than Cal and Hazel's own biological children.

Mother agreed Ludmila and Serafina are bonded with Cal and Hazel. No witness testified that Ludmila and Serafina were bonded with Mother or Father. Mother contends that she did not have the opportunity to bond with the children.

19

The testimony established that during COVID, Mother and Father would visit via video conference daily at times, and weekly in person. Schriber testified that two visits she supervised "went well". However, Ms. Gomez, Hazel and Cal, who supervised visits, reported some improper conduct during the visits, including an incident where Father called Cal and/or Hazel a "fucking cunt". Mother points to Hazel's testimony that Mother's visits have been largely appropriate, that inappropriate behavior occurring during visits was attributable to Father and that she would follow-up by apologizing for his behavior.

On the balance, this factor is slightly supportive of the conclusion that termination of Mother's parental rights is in the best interest of Ludmila and Serafina.

### 2. The children's physical and emotional needs, now and in the future

Regarding the second *Holly* factor, we note that the need for permanence is a paramount consideration for the child's present and future physical and emotional needs. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The goal of establishing a stable, permanent home for a child is a compelling government interest. *Id*. A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs. *In re J.T.G.*, No. 14-10-00972-CV, 2012 WL 171012, at *17 (Tex. App.—Houston [14th Dist.] Jan. 19, 2012, pet. denied). A factfinder may infer from a parent's past inability to meet the child's physical and emotional needs the parent's inability or unwillingness to meet the child's needs in the future. *Interest of D.M.M.*, No. 14-18-00750-CV, 2019 WL 546029, at *8 (Tex. App.—Houston [14th Dist.] Feb. 12, 2019, pet. denied).

At the time of trial, Mother remained dependent on Father for housing and financial support. Mother did not have a job and the only reason she was looking

20

for one was because her FSP required that she seek employment. Mother moved back and forth from the apartment and the house she shared with Father, she briefly lived with Father at his mother's ("Karen") home, and she lived at her parents' home for short periods of time during the pendency of the case. She fixed up a room for the twins, which the Department's caseworker agreed was suitable in certain respects.

A factfinder could reasonably conclude that Mother's past foreshadows a number of likely events that prevent her from being able to care for the children if they are returned to her. Based on the history of Mother and Father it is reasonably foreseeable to a fact finder that Father injures Mother such that she is unable to care for the twins, that Mother returns to rehab, and cannot perform regular parenting duties, or that Mother becomes so intoxicated she is unable to perform the physical tasks or emotional support essential to caring for the children.

This factor weighs in favor of terminating Mother's parental rights.

### 3. The emotional and physical danger to the children, now and in the future

A parent's drug use supports a positive finding on the third *Holly* factor that termination is in the best interest of the child. *Interest of D.M.M.*, No. 14-18-00750-CV, 2019 WL 546029, at *8 (Tex. App.—Houston [14th Dist.] Feb. 12, 2019, pet. denied). The factfinder can give "great weight" to the "significant factor" of drug-related conduct. *In re K.C., 219 S.W.3d 924*, 927 (Tex. App.–Dallas 2007, no pet.); *see also, In re J.J.W.*, No. 14-18-00985-CV, 2019 WL 1827591, at *6 (Tex. App. Houston [14th Dist. 2019, pet. denied) ("Drug abuse and its effect on the ability to parent can present an endangering course of conduct.").

Mother claims she has been sober since September 23, 2020 but tested positive for ethyl glucuronide three times after that date; Mother admits having a

problem with alcohol. Both Mother's mother, Maria, and Mother's mother-in-law, name, believe Mother is addicted to alcohol. As the factfinder, the judge was free to weigh with skepticism Mother's explanation that her falling down and seemingly intoxicated behavior is attributable to her seizure disorder.

Additionally, a factfinder may infer from the parent's past conduct endangering the child's well-being that similar conduct will recur in the future. See *Interest of E.C.S.*, No. 14-19-00039-CV, 2019 WL 2589943, at *7, *8 (Tex. App.—Houston [14th Dist.] June 25, 2019, no pet.) (mem. op.); *Interest of D.M.M.*, No. 14-18-00750-CV, 2019 WL 546029, at *14 (Tex. App.—Houston [14th Dist.] Feb. 12, 2019, pet. denied) (mem. op.). In the face of overwhelming evidence and contrary to her own outcries, on multiple occasions and despite evidence of such, Mother denied Father committed family violence against her, refused to acknowledge she was a victim of domestic abuse, and continued to live with Father. Ludmila and Serafina were removed because they were not safe in the hotel room with their intoxicated parents who were unable to care for them; the first thing Mother asked when the police arrived was for Father to be removed. Because of the hostile atmosphere the officer had to call for backup.

The trial court reasonably could have weighed this *Holly* factor in favor of finding terminating Mother's parental rights was in the best interest of the children.

### 4. The parental ability of the individuals seeking custody

The Department's placement with Cal and Hazel, and Cal and Hazel's parenting abilities remains uncontested. Although Cal and Hazel indicated a willingness to adopt Ludmila and Serafina, the option remained available to the court to keep them with Cal and Hazel without terminating Mother's rights.

Thus, Mother contends that just because she is not currently in a position to

22

full-time parent a child, it does not follow that termination is in Ludmila and Serafina's best interest. But even if we consider Mother's parenting abilities relevant to the custodial relationship she seeks, this factor still does not weigh in her favor. Testimony was adduced that Mother already had another child of whom she no longer has possessory custody, and has visitation rights, but Mother failed to demonstrate her efforts, if any, toward nurturing that relationship. Mother testified that she saw the older child approximately 2 months before trial, but before that time, had not seen her for almost one year because Mother refused to undergo SoberLink testing. The trial court could have reasonably concluded that Mother had not demonstrated any significant parenting abilities under the same circumstances she desires to participate in Ludmila and Serafina's lives. The trial court reasonably could have weighed this factor in favor of finding that terminating Mother's parental rights was in the best interest of the children.

*5. Programs available to assist the person seeking custody in promoting the best interest of the children*

The Department provided Mother with a practical plan aimed at promoting the best interest of Ludmila and Serafina. Yet, Mother concedes she did not complete her FSP. After attending "more than six" inpatient and outpatient rehabilitation programs in seven years, Mother achieved continuing periods of sobriety only twice for a total of approximately 15 months.[6] The programs have not yet proven fully effective, but the trial court could reasonably infer these programs remained available to assist Mother. This factor slightly favors a finding that

---

[6] By reference to these numbers, we only intend to illustrate the statistical challenge of a recovery on pace with Ludmila and Serafina's childhood. We acknowledge and do not belittle Mother's tireless efforts, trying and failing and trying again, and again. We admire her commitment in the past, and even efforts she has shown during the pendency of the case, and implore her to utilize all the resources available to her.

23

terminating Mother's parental rights is in the best interest of the children.

### 6 & 7. The plans for the child by the individuals or agency seeking custody, and the stability of the home or proposed placement

When asked about her plans for Ludmila and Serafina, Mother focuses on her plans for herself; that she wants only the chance to prove to the twins that she loves them and can be a good parent. Cal and Hazel offered testimony of plans more closely connected with Ludmila and Serafina's well-being, desiring to offer them a safe, peaceful, happy stress-free home. The trial court reasonably could have weighed this factor in favor of terminating Mother's parental rights.

Ms. Schriber agreed the home and room that Mother had set up for the twins was "nice," but that it did not measure up to the "safe, stable, happy home" she envisioned for the girls. She explained more that would be necessary than a dwelling and furniture. Testimony offered about conduct during visitations, evidence of threats Father made to Cal and Hazel, Mother's unwillingness to recognize and separate from her violent relationship with Father, are relevant considerations.

This factor slightly favors a finding that terminating Mother's parental rights is in the best interest of the children.

### 8 & 9. Acts, omissions, and excuses of existing parent-child relationship: Noncompliance with subsection (O) and Excuses for Noncompliance

Evidence supporting termination under the grounds listed in section 161.001(b)(1) also can be considered in support of a finding that termination is in the child's best interest. *See C.H.*, 89 S.W.3d at 27 (holding the same evidence may be probative of both section 161.001(b)(1) grounds and best interest). In determining the best interest of the child in proceedings for termination of parental rights, the trial court properly may consider that the parent did not comply with the

24

court-ordered service plan for reunification with the child. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013).

Mother tested positive for both ethyl glucuronide and amphetamines during the pendency of the case and failed to provide an explanation to justify her continuing alcohol problems through the term of her service plan. Though she admits to having an alcohol problem generally, she cannot account for her continued use of alcohol during the period in which her parental rights could be won or lost.

Similarly, after the Department involved itself in her life regarding domestic violence, she was given an opportunity to enroll in programs to help her face these issues. Mother failed to respond to providers who called her to set appointments. She failed to "start the domestic violence victim program that [s]he was recommended to complete."

This factor favors a finding that terminating Mother's parental rights is in the best interest of the children.

*Concluding Analysis of Holly factors*

Applying the applicable *Holley* factors to the evidence, we conclude that legally and factually sufficient evidence supports the trial court's finding that termination of Mother's parental rights is in Ludmila and Serafina's best interests. *See In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.–Fort Worth 2006, no pet.) (considering the parent's drug use, inability to provide a stable home, and failure to comply with a family-service plan in holding the evidence supported the best-interest finding). Based on the evidence presented, the trial court reasonably could have formed a firm belief or conviction that terminating Mother's rights served Ludmila and Serafina's best interests so that they quickly could achieve

25

permanency through adoption. *See In re T.G.R.–M.*, 404 S.W.3d 7, 17 (Tex. App.–Houston [1st Dist.] 2013, no pet.); *M.G.D.*, 108 S.W.3d at 513–14.

Accordingly, we overrule Mother's sole issue.

## IV. FATHER'S CHALLENGE BASED ON THE TRIAL COURT'S UNOBJECTED-TO REMARKS

In his second issue, Father states that "the trial judge made numerous comments during trial that exhibited clear bias and prevented Father from receiving a fair trial." Father argues in the alternative that his counsel was ineffective for failing to object.

## A. Standards of Review

### 1. Impartial trial.

All parties have a right to a fair and impartial trial before a neutral judge. *See Markowitz v. Markowitz,* 118 S.W.3d 82, 86 (Tex. App.--Houston [14th Dist.] 2003, pet. denied). When a claim of judicial bias is raised, we review the record to determine whether it shows the judge's bias or prejudice denied the defendant due process. *See Abdygapparova v. State*, 243 S.W.3d 191, 198 (Tex. App.—San Antonio 2007, pet. ref'd).

It is only in the rarest circumstances, however, that judicial rulings demonstrate the degree of favoritism or antagonism necessary to show that a fair and impartial trial was not possible. *Markowitz,* 118 S.W.3d at 87. Rulings with which a party disagrees are best brought as grounds for appeal rather than evidence of judicial bias. *Id.* Unfavorable rulings do not alone show judicial bias or prejudice. *Leleo v. State*, No. 01-20-00034-CR, 2022 WL 243917, at *42 (Tex. App.—Houston [1st Dist.] Jan. 27, 2022, no pet. h.). Instead, the judicial ruling must "connote a favorable or unfavorable disposition or opinion that is somehow

wrongful or inappropriate, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess ... or because it is excessive in degree." *Id.* (quoting *Liteky v. United States*, 510 U.S. 540, 550 (1994)); *see also Avilez v. State*, 333 S.W.3d 661, 675 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd).

### 2. *Ineffective assistance*.

With respect to complaints of ineffective assistance, we apply the *Strickland* test in parental-termination proceedings. *Interest of M.T.R.*, 579 S.W.3d 548, 573–74 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) referring to *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Strickland* imposes a two-pronged standard to establish an ineffective-assistance claim. First, the parent must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the parent must show that the deficient performance prejudiced the case. This requires showing that counsel's errors were so serious as to deprive the party of a fair trial—a trial whose result is reliable. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. In other words, a parent must show that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the parent's case. *M.S.*, 115 S.W.3d at 545.

To determine whether representation was deficient, we must consider all of the circumstances surrounding the case and determine whether counsel was "reasonably effective." *Id.* In doing so, we afford great deference to counsel's performance, indulging "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. 2052). Only if counsel's conduct is "so outrageous that no competent attorney would have engaged in it" will we find such performance

27

deficient. *Id.* (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

In conducting the harm analysis under the second prong of *Strickland*, reviewing courts must determine whether there is a reasonable probability that, but for the deficient performance, the result of the proceeding would have been different. *M.S.*, 115 S.W.3d at 550. In this context, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. Thus, the parent must also show that "counsel's deficient performance prejudiced the defense." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052).

**B. Is Father entitled to a new trial based on remarks made by the trial court to which his counsel did not object?**

Father refers us to three comments, and contends that the "totality" of these three comments made by the trial court "sufficiently illustrate [the trial court's] implicit bias towards [Father] and favoritism towards the caregiver, [Cal]". Below we first analyze each of the three comments, as framed in Father's complete complaint to each comment in his brief:

*Complaint that the judge's comment made during Cal's testimony illustrates bias in favor of Cal*

First the judge made the following statement during the caregiver, [Cal's] testimony, which indicates bias in favor of the caregiver:

[S]o what I sense if that you're testifying to what you believe is genuine[,] Ms. Smith will follow up with anything that she feels that she needs to be followed up on or if there needs to provide more explanation. So at this point, just answer Mr. Shireman's question, and trust that Ms. Smith will do her job when it gets back around her to re-questioning you.

Father provides little context to support his argument. The record shows that the judge's comment was not made spuriously, as if immediately following an answer Cal provided. Rather, the excerpted comment followed an exchange between counsel that began with the cross examiner's (Shireman's) "nonresponsive"-objection to Cal's answer, which was followed by another attorney's (Smith's) objection that the cross-examiner was "interrupting witnesses testimony" – Smith then remarked on the cross-examiner's professionalism, which prompted Shireman to object as a "sidebar." It was following this sequence—first, Cal's testimony, Shireman's "non-responsive" objection, Smith's objection to Shireman's objection then Smith's own remark, and Shireman's objection to Smith's remark—that the court inserted itself as it did.

Trial courts are encouraged to exercise reasonable control over the mode of examining witnesses and presenting evidence so as to avoid wasting time and to protect witnesses from harassment or undue embarrassment. Tex. R. Evid. 611(2), (3). Taken in context, it would seem the court was just exercising reasonable control over the proceeding. *See Metzger v. Sebek*, 892 S.W.2d 20, 38 (Tex. App.—Houston [1st Dist.] 1994, writ denied). It is common practice for trial judges seeking to curb objections that disrupt a witness's testimony to remind counsel of their opportunity to further examine the witness. We conclude the judge's comment did not amount to a demonstration of bias or prejudice in favor of Cal or against Father.

### *Complaint as to judge's comment made during Mother's testimony that Mother's testimony was responsive to Father's nonverbal cues*

Next, during [Mother's] testimony, the trial judge stated:

> So, no. I've been watching this. Every time you say something that [Father] doesn't like then you want to go back to that question and correct your answer. So I guarantee you, what

29

you're wanting the question to be repeated was, who has primary custody. When Mr. Shireman asked that question, [Father] raised his eyebrow. So no, no, you cannot change your answer.

On the record before us, we cannot ascertain that the judge's comment was inappropriate. If in fact the judge had observed Father nonverbally communicating to Mother during her testimony (whether or not she also observed the witness modify her answers), then the judge was within her discretion to address and curb the inappropriate conduct. Likewise, if the judge in fact observed the witness modify her answers, the judge was within her discretion to address the witness's conduct in the manner described. To the extent, if any, the trial court was incorrect about Mother's motivation for her request to repeat the previous question, neither Mother's attorney nor Father's attorney objected to the trial court's statement. This was a fair expression for the court to assert in the course of managing the trial. *Metzger*, at 38. To the extent the judge's comment is characterized as an opinion, on its face, her opinion about Mother's motivation for asking the question was based on what she "heard and saw during the trial," which was not improper, and does not show bias. *See Barrientos v. Nava*, 94 S.W.3d 270, 291-92 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

### *Complaint of comment made during Father's testimony that the court was "articulating feelings" about Father's testimony*

[D]uring [Father's] testimony, [Father] answered a question related to how he plans to show he has changed as follows:

To show that we are remaining sober; to show that we're instilling our core values and morales [sic]; to – to show how we can support the girls' every needs and more; to do anything and everything; and to give them the things that they need to have a great life and to be able to provide that. And so allowing us to – with the joint management [sic] conservatorship will give us time, because we haven't had time to spend with the

30

girls this entire time. That would give us the time to show to people that, hey you know, these guys have changed and they can be great parents to their children, and their children deserve for them to be great parents. And so this would give us the chance to prove that.

In response to an objection as nonresponsive, the trial judge articulated her feelings about his testimony:

It's a lot of words that – I don't know if he's saying much. It is a lot of words.

As with the previous comments, this third comment by the judge makes more sense in context. The question asked of Father was: "Tell the Court what specifically — tell the Court what specifically you think you need to work on so you can become the parent you described for these girls." This ultimately yielded Father's 133-word answer, to which the ad litem attorney (who had asked the question) objected to as non-responsive. The objection was not sustained, there was no adverse ruling, and shortly after the judge's remark the ad litem stated "And I agree. He named the specifics". The testimony was not stricken.

At worst, the comment illustrated the judge's impatience, annoyance or dissatisfaction. *Liteky v. United States*, 510 U.S. 540, 555–56, 114 S. Ct. 1147, 1157, 127 L. Ed. 2d 474 (1994)("Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women. . .sometimes display").

### *Whether the totality of the record demonstrates a deprivation of Father's due process rights to a fair trial*

Even if we presume the complained-of comments are of the rare sort that require our review in the absence of an objection, upon our review of the three comments and the entire record, we cannot conclude that record demonstrates a deprivation of Father's due process rights to a fair trial. *See Markowitz*, 118

S.W.3d at 88 (concluding the cumulative effect of roughly thirty rulings we conclude that the trial judge did not exhibit deep-seated favoritism or antagonism that would make fair judgment impossible); *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240 (Tex. 2001)(reversing court of appeals, concluding trial court's seven comments toward employee's counsel were insufficient to support a finding of judicial bias or misconduct); *Metzger v. Sebek*, 892 S.W.2d 20, 39 (Tex. App.—Houston [1st Dist.] 1994, writ denied)(concluding the cumulative effect of over 150 incidents pointed out by appellant during trial that lasted over a month, including some incidents where jurors could reasonably perceive that the judge had been impatient, agitated, and angry at appellant's counsel did not show partiality or bias).

## B. Is Father entitled to a new trial based on his claim that his trial counsel was ineffective?

Father has not attempted to show how his counsel's failure to object to these comments meets either prong of the *Strickland* test for ineffective assistance. Because we find that none of the comments cited by Father amounted to a due process violation illustrating bias, we likewise find that his failure to object to the complained-of comments on those grounds would not and did not result in ineffective assistance of counsel. Taking into account all of the circumstances surrounding the case, Father's counsel's performed in a reasonably effective manner. See *Strickland*, 466 U.S. at 545. We cannot conclude that Father's counsel's representation was so grossly deficient so as to render the proceeding fundamentally unfair. *Id*.

Accordingly, we overrule Father's second issue.

### V. CONCLUSION

Having overruled each of the issues presented, we affirm the judgment of the

trial court.

/s/    Randy Wilson
Justice

Panel consists of Justice Wise, Poissant and Wilson.